**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RESMIE KHAN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>NEW YORK CITY HEALTH AND HOSPITALS CORPORATION,<br><br>Defendant. | Case No. 26-cv-4549<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

Plaintiff Resmie Khan ("Plaintiff" or "Plaintiff Khan"), on behalf of herself and all others similarly situated ("Class Members" or "the Class"), by and through her undersigned counsel, brings this action against Defendant New York City Health and Hospitals Corporation ("NYCHHC" or "Defendant"), based upon personal knowledge with respect to herself and on information and belief derived from, among other things, investigation of counsel and review of public documents as to all other matters.

## I. SUMMARY OF THE ACTION

1. Plaintiff brings this class action against Defendant for its failure to secure and safeguard consumers' personally identifiable information ("PII") and protected health information ("PHI") (collectively, "Private Information") that Defendant collected, processed, and maintained in connection with providing healthcare services, and for failing to provide timely, accurate and adequate notice to Plaintiff and other Class Members that their Private Information had been unlawfully accessed and precisely what types of information were stolen.

2. Defendant collected and maintained the Private Information of the Proposed Class

Members, who are current and former patients and employees of NYCHHC (and, in some instances, their family members) (collectively, "Class Members"). The categories of personally identifiable information ("PII") entrusted to and exposed by Defendant include names; Social Security numbers; driver's license numbers and other government-issued identification numbers; taxpayer identification numbers and IRS-issued identity protection numbers; precise geolocation data; credit and debit card numbers; financial account information and credentials; online account credentials; billing information, including claims and payment data; biometric information, including fingerprints and palm prints; and health insurance information, including plans and policies, insurer names, member and group identification numbers, and Medicaid, Medicare, and other government payor identification numbers.[1]

3. Plaintiff also sues NYCHHC for failing to protect the PHI of Plaintiff and the Class – including medical record numbers, disability codes, diagnoses, medications, test results, diagnostic images, and treatment plans.[2]

4. NYCHHC operates the public hospital and health care systems for the City of New York and provides medical and related services through a network of hospitals, clinics, and long-term care facilities. As NYCHHC describes itself, it "is the nation's largest municipal health care delivery system in the United States dedicated to providing the highest quality health care services to all New Yorkers with compassion, dignity and respect, and regardless of immigration status or ability to pay."[3]

---

[1] *See* NYC Health + Hospitals – Notice of Data Breach, https://www.nychealthandhospitals.org/pressrelease/notice-of-data-breach/ (last visited May 28, 2026).

[2] *Id.*

[3] https://www.nychealthandhospitals.org/about-nyc-health-hospitals/ (last visited May 28, 2026).

5. Defendant's investigation purportedly determined "that an unauthorized actor accessed certain NYC Health + Hospitals' systems between approximately November 25, 2025 and February 11, 2026, and copied certain files from those systems."[4]

6. Although Defendant knew of the intrusion on or about February 2, 2026, it did not provide notification of the Data Breach until on or about March 24, 2026 – almost two months later.[5]

7. Defendant owed a non-delegable duty to Plaintiffs and Class Members to implement reasonable and adequate cybersecurity measures to protect their Private Information, which it breached as alleged herein.

8. Failing to implement reasonable and adequate cybersecurity measures has significant consequences for the patients and employees whose records are unlawfully accessed by cybercriminals and identity thieves.

9. The Private Information of Plaintiff and the Class of individuals she seeks to represent was compromised due to Defendant's acts and omissions and failure to implement adequate and reasonable cyber-security measures to ensure its computer systems were protected.

10. On information and belief, intruders were able to penetrate Defendant's environment because Defendant neglected one or more of its core security duties, including by: (i) failing to design, implement, monitor, and maintain reasonable network safeguards against foreseeable threats; (ii) failing to adopt and maintain reasonable data-retention policies; (iii) failing to adequately train its workforce on data security; (iv) failing to conform to industry-standard security practices; (v) failing to disclose to Plaintiff and Class Members that its security was

[4] *Id.*
[5] *Id.*

inadequate; (vi) failing to encrypt, or to adequately encrypt, the Private Information; (vii) failing to timely detect that its network had been compromised so that the resulting harm could be mitigated; (viii) failing to deploy readily available tools capable of detecting and stopping an attack of this kind; and (ix) otherwise failing to secure its systems with reasonable and effective procedures free of foreseeable vulnerabilities. Collectively, these lapses made NYCHHC an inviting target.

11. Defendant could have prevented this Data Breach. Similar breaches have occurred at other medical service providers, and healthcare data has repeatedly been identified as being at an "all-time high risk," underscoring the well-known and foreseeable threat to sensitive medical information.[6]

12. The Data Breach was the inevitable result of Defendant's inadequate approach to data security and the protection of the Private Information that it collected during the course of its business.

13. Defendant disregarded the rights of Plaintiff and Class Members by intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected, failing to disclose to its customers the material fact that it did not have adequate computer systems and security practices to safeguard the Private Information, failing to take available steps to prevent and stop the breach from occurring, and failing to monitor and detect the breach on a timely basis.

14. As a result of the Data Breach, Plaintiff and Class Members suffered concrete injuries in fact including, but not limited to: (i) theft of their Private Information; (ii) invasion of

---

[6] Anas Baig, *Healthcare Data Breach Cost: Key Stats & How to Reduce Risk in 2025, Securiti.ai*, https://securiti.ai/healthcare-data-breach-cost/ (last accessed May 28, 2026).

privacy ; (iii) lost or diminished value of their Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) the risk of misuse of the compromised data and an increase in spam calls, texts, and/or emails; (vii) nominal damages; and (viii) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect their Private Information.

15. Through this Complaint, Plaintiff seeks to redress the injuries related to the Data Breach on behalf of herself and all similarly situated individuals whose Private Information was unlawfully accessed and stolen during the Data Breach.

16. Plaintiff and Class Members have a continuing interest in ensuring that their Private Information is properly safeguarded, and they should be entitled to injunctive and other equitable relief.

17. On behalf of herself and the Class, Plaintiff asserts claims for negligence, breach of implied contract, unjust enrichment, and declaratory judgment, all arising from the Data Breach. She seeks damages as well as injunctive relief, including an order requiring Defendant to adopt security practices sufficient to protect the Private Information in its custody and to prevent a recurrence, and to furnish lifetime identity-theft protection services to Plaintiff and the Class.

## II. <u>PARTIES</u>

18. Plaintiff Resmie Khan resides in the State of New York, in Bronx County. Plaintiff's Private Information provided to Defendant was compromised in the Data Breach. She is a citizen of Guyana.

19. Plaintiff entrusted her Private Information to Defendant with the reasonable expectation that Defendant would keep it confidential and protect it from unauthorized access.

20. Plaintiff places a high value on her privacy and is cautious about disclosing her sensitive information. She takes care to protect her Private Information and keeps documents containing it in a safe and secure place.

21. When the Data Breach occurred, Defendant was holding Plaintiff's Private Information in its databases and systems. Those systems were not adequately secured, and that inadequacy allowed cybercriminals to access and take Plaintiff's Private Information.

22. Plaintiff further believes that her Private Information, along with that of the Class, has been or will be trafficked on illicit criminal channels, including the dark web, in the wake of the Data Breach.

23. Plaintiff has already sustained concrete injury from the exposure and theft of her Private Information, including: (a) the burden of mitigation, such as investigating the Data Breach and monitoring her financial accounts to detect identity theft and fraud; (b) the diminished value of her Private Information, an intangible asset that loses worth once it is in criminal hands; (c) the loss of her privacy; and (d) an ongoing, imminent, and impending risk of financial identity theft and fraud.

24. The risk to Plaintiff is not fleeting. She will remain exposed to a substantial and impending threat of fraud and identity theft, and the attendant harms, for years to come.

25. Defendant New York City Health and Hospitals Corporation is a New York public benefit corporation which serves as the municipal hospital for the people of the City of New York. Defendant is headquartered at 50 Water Street, New York, New York 10014.

## III. JURISDICTION AND VENUE

26. This Court has original jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(2), because the matter in controversy, exclusive of interest and costs, exceeds the sum value of $5,000,000.00, involves more than 100 class members, and several Class Members are citizens of different states than Defendant.

27. This Court has personal jurisdiction over Defendant because it is registered to do business and maintains its principal place of business in this District.

28. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendant's principal place of business is in this District and therefore Defendant resides in this District pursuant to 28 U.S.C. § 1391(c)(2). Venue is further proper in this District under § 1391(b)(2) because a substantial part of the events or omissions giving rise to the Class' claims also occurred in this District.

## IV. FACTUAL ALLEGATIONS

***Defendant Acquires, Collects, and Maintains Plaintiff's and Class Members' Private Information***

29. Defendant NYCHHC is the largest public health system in the United States, operating the public hospital and health care system for the City of New York and provides medical and related services through a network of hospitals, clinics, and long-term care facilities. According to its website, NYCHHC "is the nation's largest municipal health care delivery system in the United States dedicated to providing the highest quality health care services to all New Yorkers with compassion, dignity and respect, and regardless of immigration status or ability to pay."[7] In the ordinary course of providing medical care, Defendant collects and maintains highly

[7] https://www.nychealthandhospitals.org/about-nyc-health-hospitals/ (last visited May 28, 2026).

sensitive patient information, including personally identifiable information and protected health information, on behalf of its current and former patients.

30. As part of its regular course of business, current and former patients, as well as employees of Defendant, including Plaintiff and Class Members, were required by Defendant to provide their highly sensitive Private Information to Defendant.

31. Upon information and belief, as part of its regular course of business, Defendant thereafter maintained and stored Plaintiff's and Class Members' Private Information on its systems.

32. Upon information and belief, while collecting Private Information from Plaintiff and Class Members, Defendant promised to provide confidentiality and adequate security for the data that it collected from them through their applicable privacy policies and through other disclosures in compliance with statutory privacy requirements.

33. By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Defendant assumed legal and equitable duties and knew or should have known it was responsible for protecting Plaintiff's and Class Members' Private Information from disclosure.

34. Defendant has publicly represented that protecting patient information was among its highest priorities. Specifically, on its Privacy Policy webpage, Defendant stated that "[t]he protection of your health information and maintaining confidentiality are a top priority for us."[8] Defendant further represented in its Notice of Privacy Practices that it would collect, use, maintain, and disclose patients' health information only in accordance with specified privacy and security

[8] *See* Notice of Privacy Practices & Patient Confidentiality, NYC Health + Hospitals, https://www.nychealthandhospitals.org/patient-privacy-notice/ (last accessed May 29, 2026).

safeguards and applicable law.

35. At the time of the Data Breach, Defendant's Notice of Privacy Practices stated that it could use and disclose patients' health information for treatment, payment, and health care operations. For example, Defendant represented that it may disclose health information to health care providers and workforce members involved in a patient's care, to coordinate treatment among hospital departments, and, when necessary, to persons outside the System involved in the patient's care. Defendant assured patients that any use or disclosure of their protected health information would be limited to authorized purposes consistent with providing medical treatment, administering health care services, and complying with applicable legal obligations.

36. Defendant's Notice of Privacy Practices further identified the limited circumstances under which patients' health information could be disclosed without written authorization. Those circumstances included: (1) inclusion in a facility directory; (2) fundraising activities; (3) certain approved research activities; (4) disclosures to family members, friends, or others involved in a patient's care or payment for care; (5) disclosures to personal representatives, parents, or guardians; (6) disclosures necessary to avert a serious threat to health or safety; (7) military and veterans affairs purposes; (8) workers' compensation matters; (9) public health activities; (10) health oversight activities; (11) legal proceedings and court-authorized disclosures; (12) law enforcement purposes; (13) notifications relating to a patient's death; (14) disclosures to coroners, medical examiners, funeral directors, and for organ donation purposes; (15) disaster relief efforts; (16) national security and intelligence activities; and (17) protective services for the President and other authorized persons.

37. The unauthorized acquisition and exfiltration of Plaintiff’s and Class Members' sensitive personal and protected health information by cybercriminals was not among the uses or

disclosures authorized by Defendant's Notice of Privacy Practices. Nor was such disclosure consistent with Defendant's representations that maintaining the confidentiality and security of patient information was a top priority. Instead, the Data Breach exposed Plaintiff’s and Class Members' information to unauthorized third parties for purposes wholly unrelated to treatment, payment, health care operations, or any other permissible disclosure identified by Defendant.

38. Due to the nature of Defendant’s services, it must store current and former patients’ Private Information, as well as employees’ Private Information, in its systems. Defendant accomplishes this by keeping the Private Information electronically, as evidenced by the Data Breach.

39. Current and former patients demand security to safeguard their Private Information. As a healthcare provider, NYCHHC is required to ensure that its current and former patients’ Private Information is not disclosed or disseminated to unauthorized third parties without express written consent.

40. By obtaining, collecting, using, and deriving a benefit from Plaintiff’s and Class Members’ Private Information, Defendant assumed legal and equitable duties and knew or should have known it was responsible for protecting Plaintiff’s and Class Members’ Private Information from disclosure.

41. Plaintiff and Class Members, as current and former patients and employees, relied on Defendant’s role as a healthcare provider and employer, to keep their sensitive Private Information confidential, securely maintained, and disclosed only as authorized..

42. Yet, contrary to these obligations, Defendant failed to adequately safeguard Plaintiff’s and Class Members’ Private Information and failed to implement reasonable data security measures, as evidenced by the Data Breach, which has affected, to date, approximately

1,800,000 individuals.[9]

***The Data Breach and Defendant's Failure to Adequately Disclose Same***

43. On or around February 2, 2026, Defendant became aware of a cybersecurity incident involving unauthorized access to current and former patient data (as well as employee data) stored on its systems. Following an investigation, Defendant confirmed that "an unauthorized actor accessed certain NYC Health + Hospitals' systems between approximately November 25, 2025 and February 11, 2026, and copied certain files from those systems."[10]

44. Despite identifying the breach in February 2026, Defendant did not provide notice of the Data Breach until March 24, 2026.

45. Defendant's Notice of Data Breach, published as a press release on its website, offered only vague and cursory details regarding the breach.[11]

46. Defendant's Notice of Data Breach failed to provide Plaintiff and Class Members basic details concerning the Data Breach, including which of Defendant's systems were impacted, how the cybercriminals accessed Defendant's network, whether the compromised data was encrypted or otherwise protected, the nature and scope of any unauthorized access or exfiltration, why Defendant did not discover the Data Breach until after it had occurred, and why Defendant delayed notifying impacted individuals for months following the incident.

47. Notably, the breach is particularly sensitive because hackers stole biometric information, including fingerprints and palm prints, which affected individuals have for life and

---

[9] *See* https://ocrportal.hhs.gov/ocr/breach/breach_report_hip.jsf (last accessed May 29, 2026).
[10] https://www.nychealthandhospitals.org/pressrelease/notice-of-data-breach/ (last accessed May 29, 2026).
[11] *See* https://www.nychealthandhospitals.org/pressrelease/notice-of-data-breach/ (last accessed May 29, 2026).

cannot replace. Defendant's Notice of Data Breach also fails to provide an explanation for why it is storing such biometric data.[12] Upon information and belief, prospective NYCHHC employees are generally required to enroll their fingerprints for criminal records background checks.[13] It is not known whether patients' biometrics were also part of the breach.[14]

48. The Data Breach occurred because Defendant did not implement adequate and reasonable cyber-security procedures and protocols to protect the Private Information of Plaintiff and Class Members. Because Defendant's data security protocols and practices were deficient, unauthorized person(s) were able to access, view, and/or exfiltrate Plaintiff's and Class Members' Private Information.

***Defendant's Data Breach Was Imminently Foreseeable and Preventable***

49. Despite the growing body of publicly available information regarding the rise of cyberattacks that compromise sensitive private information, Defendant's approach to maintaining the privacy of Plaintiff's and Class Members' Private Information was inadequate, unreasonable, negligent, and reckless.

50. Private Information, including Social Security numbers and health-related records, are highly valuable commodities and frequent targets of cybercriminals. Companies that collect and maintain such sensitive information, including Defendant, know or reasonably should know that they are attractive targets for cyberattacks.

51. The Cybersecurity and Infrastructure Security Agency ("CISA") of the United

---

[12] https://techcrunch.com/2026/05/18/nyc-health-and-hospitals-says-hackers-stole-medical-data-and-fingerprints-during-breach-affecting-at-least-1-8-million-people/ (last accessed May 29, 2026).

[13] *Id.*

[14] *Id.*

States has designated the healthcare and health sector as critical infrastructure.[15] As a provider of critical infrastructure, Defendant knew or should have known that there was a significant risk of a cyber-attack on its computer networks and systems. The Department of Homeland Security states that "[c]ybersecurity threats to critical infrastructure are one of the most significant strategic risks for the United States."[16]

52. As a healthcare service provider, Defendant should have been aware of the industry's ongoing struggle to address increasingly sophisticated cyberattacks. Since at least 2021, healthcare data breaches have risen to historically high levels in the United States. In 2022, the United States Department of Health and Human Services Office for Civil Rights ("OCR") received reports of 720 healthcare data breaches affecting 500 or more individuals.[17] In 2023, OCR received reports of 725 such breaches, exposing more than 133 million individuals.[18] Although the annual number of reported breaches has hovered in the range of approximately 700 to 725 incidents, the number of impacted individuals has increased dramatically. For example, between 2023 and 2024, the number of impacted individuals have increased dramatically from approximately 138 million to 259 million.[19]

---

[15] *Critical Infrastructure Sectors*, Cybersecurity and Infrastructure Security Agency (CISA), https://www.cisa.gov/topics/critical-infrastructure-security-and-resilience/critical-infrastructure-sectors (lasted visited May 28, 2026).

[16] U.S. Dep't of Homeland Sec., Secure Cyberspace and Critical Infrastructure, https://www.dhs.gov/archive/secure-cyberspace-and-critical-infrastructure (last accessed May 28, 2026).

[17] Sean Roy, *HIPAA Compliance Statistics: Key Stats & How to Reduce Risk in 2025,* Dialog Health, https://www.dialoghealth.com/post/hipaa-compliance-statistics (last accessed May 28, 2026).

[18] Anne Turner, *Securing Electronic Protected Health Information: The Role of Data Discovery in Modern Healthcare*, Ground Labs (Apr. 25, 2024), https://groundlabs.com/blog/data-discovery-electronic-personal-health-information (last accessed May 28, 2026).

[19] John Riggi & Scott Gee, *2025 Cybersecurity Year in Review, Part One: Breaches and Defensive Measures*, Am. Hosp. Ass'n (Oct. 7, 2025), https://www.aha.org/news/aha-cyber-

53. In light of the largest healthcare breaches of 2023, including but not limited to HCA Healthcare (11,270,000 individuals affected), Perry Johnson & Associates, Inc. (8,952,212 individuals affected), Managed Care of North America (8,861,076 individuals affected), Welltok, Inc. (8,493,379 individuals affected), HealthEC LLC (4,452,782 individuals affected), and Reventics, LLC (4,212,823 individuals affected), Defendant knew or should have known that the Private Information it collected and maintained would be a prime target for cybercriminals.[20]

54. In light of the largest healthcare breaches of 2024, including but not limited to Change Healthcare Inc. (190,000,000 individuals affected), Kaiser Foundation Health Plan, Inc. (13,400,000 individuals affected), Ascension Health (5,599,699 individuals affected), HealthEquity, Inc. (4,300,000 individuals affected), and Concentra Health Services, Inc. (3,998,163 individuals affected), Defendant knew or should have known that the Private Information it collected and maintained would be a prime target for cybercriminals.[21]

55. In light of the largest healthcare breaches of 2025, including but not limited to Conduent Business Services LLC (currently known to be more than 25 million individuals affected), Aflac (13,924,906 individuals affected), Yale New Haven Health System (5,556,702 individuals affected), Episource, LLC (5,418,886 individuals affected), Blue Shield of California (4,700,000 individuals affected), DaVita Inc. (2,689,826 individuals affected), and Anne Arundel Dermatology (1,905,000 individuals affected), Defendant knew or should have known that the

intel/2025-10-07-2025-cybersecurity-year-review-part-one-breaches-and-defensive-measures (last accessed May 28, 2026).

[20] Dean Levitt, *76 HIPAA Breach Report Statistics for 2023*, Paubox (Jan. 24, 2024), https://www.paubox.com/blog/76-hipaa-breach-report-statistics-for-2023 (last accessed May 28, 2026).

[21] Steve Alder, *2024 Healthcare Data Breach Report*, HIPAA J. (Jan. 30, 2025), https://www.hipaajournal.com/2024-healthcare-data-breach-report/. (last accessed May 28, 2026).

Private Information it collected and maintained would be a prime target for cybercriminals.[22]

56. To mitigate the heightened risk of ransomware attacks and other data breaches, including the incident that led to the Data Breach, Defendant could and should have implemented the following preventive measures, as recommended by the United States Government:

- **Implement an awareness and training program:** Educate employees and individuals about the threat of ransomware and how it is delivered, as end users are often the primary targets.

- **Enable strong spam filters:** Prevent phishing emails from reaching end users by using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to block email spoofing.

- **Scan all incoming and outgoing emails:** Detect threats by scanning emails and filtering executable files to prevent them from reaching end users.

- **Configure firewalls:** Block access to known malicious IP addresses to prevent unauthorized access.

- **Patch operating systems, software, and firmware:** Regularly update and patch devices, potentially using a centralized patch management system for greater efficiency.

- **Set anti-virus and anti-malware programs for regular scans:** Ensure these programs run automatic scans to detect and remove potential threats.

- **Manage privileged accounts based on the principle of least privilege:** Limit administrative access to users only when absolutely necessary, and ensure those with admin privileges use them only when required. Implement an awareness and training program.

- **Configure access controls:** Implement least privilege principles for file, directory, and network share permissions. Users should only have access to what they need—

---

[22] Steve Alder, *Largest Healthcare Data Breaches of 2025*, HIPAA J. (Jan. 2, 2026), https://www.hipaajournal.com/largest-healthcare-data-breaches-of-2025/ (last accessed May 28, 2026).

if a user only needs to read specific files, they should not have write access to those files, directories, or shares.

- **Disable macro scripts in office files transmitted via email:** Prevent the execution of potentially harmful macros by disabling them in office files sent via email. Consider using Office Viewer software instead of full office suite applications to open email attachments.

- **Implement Software Restriction Policies (SRP):** Use SRPs or similar controls to prevent programs from executing from common ransomware locations, such as temporary folders associated with web browsers or compression programs, including the AppData/LocalAppData folder.

- **Disable Remote Desktop Protocol (RDP):** If RDP is not in use, consider disabling it to reduce potential attack vectors.

- **Use application whitelisting:** Allow only programs that are explicitly permitted by security policy to execute, blocking any unauthorized or potentially malicious software.

- **Execute operating system environments or specific programs in a virtualized environment:** Run sensitive systems or programs in isolated virtual environments to reduce risk.

- **Categorize data based on organizational value:** Implement physical and logical separation of networks and data for different organizational units to protect critical information and ensure appropriate access control.[23]

57. To mitigate the heightened risk of ransomware attacks and other data breaches, including the incident that led to the Data Breach, Defendant could and should have implemented the following preventive measures, as recommended by the Federal Trade Commission ("FTC") in its latest update to *Protecting Personal Information: A Guide for Business*:

- Know what personal information you have in your files and on your computers.

[23] U.S. Dep't of Just., Crim. Div., *Computer Crime & Intellectual Prop. Section, How to Protect Your Networks from Ransomware*, https://www.justice.gov/criminal/criminal-ccips/file/872771/dl (last accessed May 28, 2026).

- Keep only what you need for your business.
- Protect the information that you keep.
- Properly dispose of information you no longer need.
- Create a plan to respond to security incidents.[24]

58. To mitigate the heightened risk of ransomware attacks and other data breaches, including the incident that led to the Data Breach, Defendant could and should have implemented the following preventive measures, as recommended by the Joint Ransomware Task Force's ("JRTF") #StopRansomware Guide, although this list does not encompass the full range of recommended actions:

- **Conduct regular vulnerability scanning to identify and address vulnerabilities**, especially those on internet-facing devices, to limit the attack surface.

- **Regularly patch and update software and operating systems to the latest available versions.** Prioritize timely patching of internet-facing servers-that operate software for processing internet data such as web browsers, browser plugins, and document readers-especially for known exploited vulnerabilities….

- **Limit the use of RDP and other remote desktop services.** If RDP is necessary, apply best practices. Threat actors often gain initial access to a network through exposed and poorly secured remote services, and later traverse the network using the native Windows RDP client.

- **Ensure all on-premises, cloud services, mobile, and personal devices are properly configured, and security features are enabled**. For example, disable ports and protocols that are not being used for business purposes.[25]

[24] Federal Trade Commission, *Protecting Personal Information: A Guide for Business,* https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last accessed May 28, 2026).

[25] Cybersecurity & Infrastructure Security Agency, *#StopRansomware Guide*, https://www.cisa.gov/resources-tools/resources/stopransomware-guide (last accessed May 28, 2026).

59. As a custodian of Private Information, Defendant knew, or should have known, the importance of safeguarding the Private Information entrusted to it by Plaintiff and Class Members, and of the foreseeable consequences if its data security systems were breached, including the significant costs imposed on Plaintiff and Class Members because of a breach.

60. Despite widespread reports of data breaches, Defendant neglected to implement the necessary safeguards to ensure the Private Information of Plaintiff and Class Members was protected.

61. Defendant was, or should have been, fully aware of the unique types and the significant volume of data in its systems, amounting to potentially hundreds of thousands of individuals' Private Information, and, thus, the significant number of individuals who would be harmed by the exposure of this data.

62. Given that Defendant was storing the Private Information it required Plaintiff and Class Members to provide, Defendant could and should have implemented some or all the above measures to prevent and detect cyberattacks.

63. The occurrence of the Data Breach indicates that Defendant failed to implement one or more of the above measures to prevent cybersecurity attacks. The failure to implement some or all of the above measures resulted in the Data Breach and the exposure of approximately 1,800,000 Class Members' Private Information.

***Plaintiff's and Class Members' Private Information Has Significant Value***

64. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[26] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other

---

[26] 17 C.F.R. § 248.201 (2013).

information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[27]

65. The Private Information of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[28]

66. Upon information and belief, the data compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information at the point-of-sale in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

67. For example, the process of replacing a Social Security number ("SSN") is both time-consuming and difficult. According to the Social Security Administration, individuals generally cannot obtain a new SSN where it has been compromised but there is no evidence of misuse. This leaves victims in a precarious position, effectively forced to wait until fraud occurs before they can take meaningful action to mitigate the damage. This delay places victims at continued risk of identity theft, financial fraud, and other forms of exploitation, making it significantly more difficult to protect themselves in the aftermath of a data breach.[29]

---

[27] *Id.*

[28] Tyler Lacoma, *Your Personal Data Is for Sale on the Dark Web—Here's How Much It Costs, Digital Trends* (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last accessed May 28, 2026).

[29] Soc. Sec. Admin., Identity Theft and Your Social Security Number (SSA Pub. No. 05-10064, Oct. 2024), https://www.ssa.gov/pubs/EN-05-10064.pdf (last accessed May 28, 2026).

68. Unauthorized access to an individual's medical records can have serious consequences. Stolen medical records can be stored for long periods, with individuals often remaining unaware that their records have been compromised or stolen.[30] Moreover, the monetary value of medical records on the dark web far exceeds that of credit card numbers. For example, the cybersecurity firm Trustwave discovered that medical records can fetch up to $250 per record on the dark web, while credit card numbers typically sell for around $5 each.[31]

69. Medical records are highly valuable to cybercriminals, not only because of the price it can be sold for on the dark web, but also due to the various ways it can be exploited. Cybercriminals can use stolen medical records to commit medical identity theft to submit fraudulent medical claims, purchase prescriptions, or receive unauthorized treatment. These actions pose significant threats and risks to patients whose medical information has been compromised, leading to potential financial, physical, and emotional harm.

70. According to the FTC, if a hacker or an individual to whom the hacker sells your medical information mixes it with your own, it could impact the medical care you receive, or the health insurance benefits available to you. The FTC's Medical Identity Theft Frequently Asked Questions highlight several red flags victims should watch for, including: (i) receiving bills for medical services they didn't receive, (ii) being contacted by debt collectors about medical debt they don't owe, (iii) seeing unrecognized medical collection notices on their credit report, (iv) spotting incorrect office visits or treatments on their explanation of benefits, (v) being informed by their health plan that they've reached their benefits limit, or (vi) being denied insurance because

[30] https://www.ifaxapp.com/hipaa/phi-hackers-risks-implications/ (last accessed May 28, 2026)..

[31] Trustwave Holdings, Inc., *2018 Trustwave Global Security Report,* https://trustwave.azureedge.net/media/15350/2018-trustwave-global-security-report-prt.pdf (last accessed May 28, 2026).

their medical records reflect a condition they do not have.

71. The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when Private Information is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[32]

72. Plaintiff and Class Members now face years of constant surveillance of their personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

***Defendant Failed to Comply with FTC Guidelines***

73. Defendant was also prohibited by the Federal Trade Commission Act ("FTCA") (15 U.S.C. § 45), from engaging in "unfair or deceptive acts or practices in or affecting commerce." The FTC has determined that a company's failure to implement reasonable and appropriate data security measures to protect consumers' sensitive personal information constitutes an "unfair practice" in violation of the Act. *See, e.g.*, *FTC v. Wyndham Worldwide Corp*., 799 F.3d 236 (3d Cir. 2015).

74. The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

[32] U.S. Gov't Accountability Off., Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown, GAO-07-737 (June 4, 2007), https://www.gao.gov/assets/gao-07-737.pdf (last accessed May 28, 2026).

75. For example, in 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. These guidelines advise businesses, *inter alia*, to protect the personal consumer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[33]

76. The guidelines further advise businesses: not to maintain PII longer than necessary for authorization of a transaction; to limit access to sensitive data; to use an intrusion detection system to expose a breach as soon as it occurs; to monitor all incoming traffic for activity indicating someone is attempting to hack the system; to watch for large amounts of data being transmitted from the system; and to verify that third-party service providers have implemented reasonable security measures.[34]

77. To underscore the binding significance and legal ramifications of the promulgated guidance, the FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of FTCA, 15 U.S.C. § 45.[35] Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

---

[33] Fed. Trade Comm'n, Protecting Personal Information: A Guide for Business, https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last accessed Apr. 7, 2026).

[34] *Id.*

[35] *See, e.g.*, *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015) (determining that a company's failure to implement reasonable and appropriate data security measures to protect consumers' sensitive personal information constitutes an "unfair practice" in violation of the Act).

78. As evidenced by the Data Breach, Defendant failed to properly implement basic data security practices.

79. Upon information and belief, Defendant was at all times fully aware of its obligations to protect the Private Information of Plaintiff and Class Members, and Defendant was also aware of the significant repercussions that would result from its failure to do so.

80. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' Private Information, or to comply with applicable industry standards, constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

***Defendant Failed to Comply with HIPAA***

81. Defendant is a covered entity under HIPAA (45 C.F.R. § 160.102) and as such was required to protect against reasonably anticipated threats to the security of Private Information in its systems. Covered entities must implement safeguards to ensure the confidentiality, integrity, and availability of PHI. Safeguards must include physical, technical, and administrative components.[36]

82. Title II of HIPAA contains the Administrative Simplification provisions, codified at 42 U.S.C. §§ 1320d–1320d-9. These provisions required the Department of Health and Human Services ("HHS") to adopt national standards governing the electronic exchange, privacy, and security of protected health information. Pursuant to this authority, HHS subsequently promulgated regulations under these provisions, including, among others, the Privacy Rule, Security Rule, and Breach Notification Rule, that establish requirements for safeguarding such

[36] Steve Alder, *What Is Considered Protected Health Information Under HIPAA?*, *HIPAA* J., https://www.hipaajournal.com/what-is-considered-protected-health-information-under-hipaa/ (last accessed May 28, 2026).

information.

83. Defendant's Data Breach resulted from a combination of insufficiencies that demonstrate Defendant failed to comply with safeguards mandated by HIPAA regulations. Defendant's security failures include, but are not limited to, the following:

a. Failing to ensure the confidentiality and integrity of electronic protected health information that Defendants creates, receives, maintains, and transmits in violation of 45 C.F.R. §164.306(a)(1);

b. Failing to implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. §164.312(a)(1);

c. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. §164.308(a)(1);

d. Failing to identify and respond to suspected or known security incidents; mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. §164.308(a)(6)(ii);

e. Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic protected health information in violation of 45 C.F.R. §164.306(a)(2);

f. Failing to protect against any reasonably anticipated uses or disclosures of electronically protected health information that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. §164.306(a)(3);

g. Failing to ensure compliance with HIPAA security standard rules by its workforce in violation of 45 C.F.R. §164.306(a)(4);

h. Impermissibly and improperly using and disclosing protected health information that is and remains accessible to unauthorized persons in violation of 45 C.F.R. §164.502, *et seq.*;

i. Failing to effectively train all members of its workforce (including agents and independent contractors) on the policies and procedures with respect to protected health information as necessary and appropriate for the members of its workforce to carry out their functions and to maintain security of protected health information in violation of 45 C.F.R. §164.530(b) and 45 C.F.R. §164.308(a)(5); and

j. Failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard protected health information, in compliance with 45 C.F.R. §164.530(c).

84. At all times, Defendant was fully aware of its responsibilities under HIPAA to safeguard consumers' private information, as reflected in its own privacy statement, yet it failed to meet these obligations. The Defendant also understood the serious consequences that would arise from its failure to comply. Given the nature and volume of the private information it collected and stored, as well as the foreseeable damage that could result, Defendant's actions were particularly egregious.

***The Data Breach Increases Victims' Risk of Identity Theft and Fraud***

85. Upon information and belief, the unencrypted Private Information of Class Members will end up for sale on the dark web as that is the *modus operandi* of hackers.

86. Unencrypted Private Information may also fall into the hands of companies that

will use the detailed Private Information for targeted marketing without the approval of Plaintiff and Class Members. Simply put, unauthorized individuals can easily access the Private Information of Plaintiff and Class Members.

87. The link between data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

88. Plaintiff's and Class Members' Private Information is of great value to hackers and cybercriminals, and the data stolen in the Data Breach has been used and will continue to be used in a variety of sordid ways for criminals to exploit Plaintiff and Class Members and to profit off their misfortune.

89. Further, the standard operating procedure for cybercriminals is to use some data, like the Private Information here, to access and/or develop "fullz packages" of that person.[37]

90. With "Fullz" packages, cyber-criminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an

[37] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See* https://venturebeat.com/security/fullz-dumps-and-cvvs-heres-what-hackers-are-selling-on-the-black-market/ (Last accessed May 28, 2026).

astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals.

91. The development of "Fullz" packages means here that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information that was exfiltrated in the Data Breach, criminals may still easily create a comprehensive Fullz package and sell it—and then resell it in perpetuity—at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

***Loss of Time to Mitigate Risk of Identity Theft and Fraud***

92. Cyberattacks and data breaches like the Data Breach are especially problematic because they can negatively impact on the daily lives of individuals affected by the attack.

93. GAO released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft face "substantial costs and time to repair the damage to their good name and credit record."[38]

94. As a result of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their private information was compromised, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud.

[38] U.S. Gov. Accounting Office, GAO-07-737, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* (June 2007), available at https://www.gao.gov/new.items/d07737.pdf (last accessed. May 28, 2026).

Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet the resource and asset of time has been lost.

95. Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as researching and verifying the legitimacy of the Data Breach, contacting credit bureaus to place freezes on their credit and checking their financial accounts. Accordingly, the Data Breach has caused Plaintiffs and Class Members to suffer actual injury in the form of lost time—which cannot be recaptured—spent on mitigation activities.

96. These efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[39]

***The Future Cost of Credit and Identity Theft Monitoring Is Reasonable and Necessary***

97. Based on the type of targeted attack in this case, sophisticated criminal activity, and the type of Private Information involved, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for various forms of identity theft crimes.

98. Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Private Information was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

[39] *Id*.

99. Consequently, Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future.

100. The retail cost of credit monitoring and identity theft protection services can range up to approximately $200 per year per Class Member. This represents a reasonable and necessary expense to monitor and protect against the risk of identity theft arising from Defendant's Data Breach.

***Loss of Benefit of the Bargain***

101. Furthermore, Defendant's poor data security practices deprived Plaintiff and Class Members of the benefit of their bargain. When agreeing to engage with Defendant, Plaintiff and Class Members understood and expected that they were, in part, paying for necessary data security to protect their Private Information, pursuant to their engagement with and as required by Defendant, when in fact, Defendant did not provide the expected data security. Accordingly, Plaintiff's and Class Members' engagement with Defendant was of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendant.

***Common Injuries & Damages***

102. As a result of Defendant's ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of Private Information ending up in the possession of criminals, the risk of identity theft to Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages, including: (i) theft of their Private Information; (ii) invasion of privacy; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) experiencing an increase in spam calls, texts, and/or emails; (vii) statutory damages; (viii) nominal

damages; and (ix) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect their Private Information.

103. The ramifications of Defendant's failure to safeguard the Private Information of Plaintiff and Class Members are long-lasting and severe. In 2024 alone, Americans lost $47 billion to identity fraud and scams, a $4 billion increase from 2023.[40] Once private information is stolen, fraudulent use of that information and damage to victims may continue for years.

***Defendants' Delay in Identifying and Reporting the Data Breach Caused Additional Harm***

104. It is axiomatic that "[t]he quicker a financial institution, credit card issuer, wireless carrier or other service provider is notified that fraud has occurred on an account, the sooner these organizations can act to limit the damage. Early notification can also help limit the liability of a victim in some cases, as well as allow more time for law enforcement to catch the fraudsters in the act."[41]

105. Indeed, once a data breach has occurred, "[o]ne thing that does matter is hearing about a data breach quickly. That alerts consumers to keep a tight watch on credit card bills and suspicious emails. It can prompt them to change passwords and freeze credit reports. And notifying

---

[40] Christina Ianzito, *Identity Fraud and Scams Cost Americans $47 Billion in 2024*, AARP (Mar. 25, 2025), https://www.aarp.org/money/scams-fraud/javelin-identity-theft-report-2024/ (last accessed May 28, 2026).

[41] Javelin Strategy & Rsch., *Identity Fraud Hits Record High with 15.4 Million U.S. Victims in 2016, Up 16 Percent According to New Javelin Strategy & Research Study* (Feb. 1, 2017), https://javelinstrategy.com/press-release/identity-fraud-hits-record-high-154-million-us-victims-2016-16-percent-according-new (last accessed May 28, 2026).

officials can help them catch cybercriminals and warn other businesses of emerging dangers. If consumers don't know about a breach because it wasn't reported, they can't take action to protect themselves" (internal citations omitted).[42]

106. Although Plaintiff's and Class Members' Private Information was improperly exposed beginning in November 2025—and Defendant learned of the exposure in February 2026—Defendant did not provide notice of the Data Breach through its website press release until March 2026, depriving them of the opportunity to promptly mitigate the potential adverse consequences of the breach.

107. As a result of NYCHHC's delay in detecting and notifying individuals of the Data Breach, the risk of fraud for Plaintiff and Class Members has been driven even higher.

## V. CLASS ALLEGATIONS

108. Plaintiff brings all claims as class claims under Federal Rule of Civil Procedure 23. The nationwide class is defined as follows:

> All persons residing in the United States whose Private Information was compromised because of the Data Breach (the "Class").

109. Excluded from the Class are Defendant and its officers, directors and employees; any entity in which Defendant has a controlling interest, is a parent or subsidiary, or which is controlled by Defendant; and the affiliates, legal representatives, attorneys, heirs, predecessors, successors, and assigns of Defendant. Also excluded are the Judges and Court personnel in this case and any members of their immediate families.

110. Plaintiff reserves the right to modify and/or amend the Class, including, but not

[42] Allen St. John, *The Data Breach Next Door, Consumer Reports* (Jan. 31, 2019), https://www.consumerreports.org/electronics/data-theft/the-data-breach-next-door-a7102554918/ (last accessed May 28, 2026).

limited to, creating additional subclasses as necessary.

111. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of the claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

112. All Class Members are readily ascertainable in that Defendant has access to addresses and other contact information for all Class Members, which can be used for providing notice to Class Members.

113. The proposed Class meets the requirements of Fed. R. Civ. P. 23(a), (b)(2), (b)(3) and (c)(4).

114. ***Numerosity.*** The Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, Plaintiff believes the proposed Class includes approximately 1,800,000 individuals who have been damaged by Defendant's conduct as alleged herein. The precise number of Class Members is unknown to Plaintiff but may be ascertained from Defendant's records.

115. **Typicality:** Plaintiff's claims are typical of the claims of the Class. Plaintiff and all members of the Class were injured through Defendant's uniform misconduct. The same event and conduct that gave rise to Plaintiff's claims are identical to those that give rise to the claims of every other Class Member because Plaintiff and each member of the Class had their sensitive Private Information compromised in the same way by the same conduct of Defendant.

116. **Adequacy:** Plaintiff is an adequate representative of the Class because Plaintiff's interests do not conflict with the interests of the Class that Plaintiff seeks to represent; Plaintiff has retained counsel competent and highly experienced in data breach class action litigation; and Plaintiff and Plaintiff's counsel intend to prosecute this action vigorously. The interests of the

Class will be fairly and adequately protected by Plaintiff and Plaintiff's counsel.

117. **Superiority:** A class action is superior to other available means of fair and efficient adjudication of the claims of Plaintiff and the Class. The injury suffered by each individual Class Member is relatively small in comparison to the burden and expense of individual prosecution of complex and expensive litigation. It would be very difficult, if not impossible, for members of the Class individually to effectively redress Defendant's wrongdoing. Even if Class Members could afford such individual litigation, the court system could not. Individualized litigation presents the potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

118. **Commonality and Predominance:** There are many questions of law and fact common to the claims of Plaintiff and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include:

a. Whether Defendant engaged in the conduct alleged herein;

b. Whether Defendant violated the FTCA;

c. Whether Defendant violated HIPAA;

d. Whether and to what extent Defendant had a duty to protect the Private Information of Plaintiff and Class Members;

e. Whether Defendant had duties not to disclose the Private Information of Plaintiff and Class Members to unauthorized third parties;

f. Whether Defendant failed to adequately safeguard Plaintiff's and the Class' Private Information;

g. Whether and when Defendant actually learned of the Data Breach;

h. Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their Private Information had been compromised;

i. Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their Private Information had been compromised;

j. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

k. Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

l. Whether Plaintiff and Class Members are entitled to actual damages and/or nominal damages as a result of Defendant's wrongful conduct; and

m. Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

119. Class certification is also appropriate because Defendant, through its uniform conduct, acted or failed and refused to act on grounds generally applicable to Plaintiff and the Class as a whole, making injunctive and declaratory relief appropriate to Plaintiff and the Class as a whole. Moreover, Defendant continues to maintain its inadequate security practices, retain possession of Plaintiff's and Class Members' Private Information, and has not been forced to change its practices or to relinquish Private Information by nature of other civil suits or government enforcement actions, thus making injunctive relief a live issue and appropriate to the Class as a

whole.

120. Finally, all members of the proposed Class are readily ascertainable. Defendant has access to the names and addresses and/or email addresses of Class Members affected by the Data Breach, as is evident by Defendant's ability to send those individuals notices about the Data Breach.

## CLAIMS FOR RELIEF

### COUNT I
### NEGLIGENCE AND NEGLIGENCE *PER SE*
### (On Behalf of Plaintiff and the Class)

121. Plaintiff re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 107, as if fully set forth herein.

122. Defendant collected, stored, and maintained the Private Information of Plaintiff and Class Members as part of the regular course of its business operations, which services affect commerce.

123. Plaintiff and Class Members entrusted Defendant with their Private Information with the understanding that Defendant would safeguard their information.

124. Defendant had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiff and Class Members could and would suffer if the Private Information were wrongfully disclosed.

125. By voluntarily undertaking and assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard its computer network—and Class Members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duties included a responsibility to implement

processes by which it could detect a breach of its security systems in a reasonably expeditious period and to give prompt notice to those affected in the case of a data breach.

126. Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act"), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

127. Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks adequately protected the Private Information stored within it.

128. Defendant's duty to implement reasonable security measures also stems from common law, as well as regulations under the FTC Act and HIPAA, both of which require the Defendant to use appropriate cybersecurity measures.

129. Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and Plaintiff and Class Members. That special relationship arose because Plaintiff and the Class entrusted Defendant with their confidential Private Information, a necessary part of engaging with Defendant, and because Defendant was in a superior position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Plaintiff and Class Members from a data breach.

130. Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

131. Moreover, Defendant had a duty to promptly and adequately notify Plaintiff and Class Members of the Data Breach.

132. Defendant had and continues to have a duty to adequately disclose that the Private Information of Plaintiff and the Class within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiff and the Class to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their Private Information by third parties.

133. Defendant breached its duties, pursuant to the FTC Act and other applicable standards, and thus was negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

- Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;
- Failing to adequately monitor the security of its networks and systems;
- Allowing unauthorized access to Class Members' Private Information;
- Failing to detect in a timely manner that Class Members' Private Information had been compromised;
- Failing to remove the Private Information of individuals it formerly engaged with when it was no longer required to retain that information pursuant to regulations; and
- Failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take appropriate action to mitigate the potential for identity theft and other damages.

134. Defendant's conduct was particularly unreasonable given the nature and amount of

Private Information it obtained and stored and the foreseeable consequences of the immense damage that would result to Plaintiff and Class Members.

135. Plaintiff and Class Members were within the class of persons the FTC Act and HIPAA were intended to protect and the type of harm that resulted from the Data Breach was the type of harm that the statute was intended to guard against.

136. Defendant's violation of the FTC Act and HIPAA also constitute negligence *per se*, as those provisions are designed to protect individuals like Plaintiff and the proposed Class Members from the harms associated with data breaches.

137. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

138. Defendant has acknowledged that an unauthorized party gained access to its systems and that the Private Information of Plaintiff and Class Members was compromised as a result of the Data Breach.

139. But for Defendant's wrongful and negligent breaches of duties owed to Plaintiff and Class Members, the Private Information of Plaintiff and Class Members would not have been compromised.

140. A breach of security, unauthorized access, and resulting injury to Plaintiff and the Class was reasonably foreseeable, particularly in light of Defendant's inadequate security practices.

141. It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data

breaches in Defendant's industry.

142. Plaintiff and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in collecting and storing the Private Information of Plaintiff and the Class, the critical importance of providing adequate security of that Private Information, and the necessity for encrypting Private Information stored on Defendant's systems or transmitted through third party systems.

143. It was therefore foreseeable that the failure to adequately safeguard Class Members' Private Information would result in one or more types of injuries to Class Members.

144. Plaintiff and the Class had no ability to protect their Private Information that was in, and is believed to remain in, Defendant's possession.

145. Defendant was in a position to protect against the harm suffered by Plaintiff and the Class as a result of the Data Breach.

146. Neither Plaintiff nor Class Members contributed to the Data Breach and subsequent misuse of their Private Information as described in this Complaint.

147. But for Defendant's wrongful and negligent breach of duties owed to Plaintiff and the Class, the Private Information of Plaintiff and the Class would not have been compromised.

148. There is a close causal connection between Defendant's failure to implement security measures to protect the Private Information of Plaintiff and the Class and the harm, or risk of imminent harm suffered by Plaintiff and the Class. The Private Information of Plaintiff and the Class was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate security measures.

149. As a direct and proximate result of Defendant's negligence, Plaintiff and the Class

have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) experiencing an increase in spam calls, texts, and/or emails; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect their Private Information.

150. Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

151. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

**COUNT II**
**Breach of Implied Contract**
**(On Behalf of Plaintiff and the Class)**

152. Plaintiff re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 107, as if fully set forth herein.

153. Defendant collected, stored, and maintained the Private Information of Plaintiff and the Class.

154. Plaintiff and Class Members provided their Private Information to Defendant in the ordinary course of Defendant's business as a requirement to engage with Defendant. Plaintiff and

Class Members paid money to Defendant in exchange for Defendant's services and would not have paid for Defendant's products or services, or would have paid less for them, had they known that Defendant's data security practices were substandard.

155. Defendant solicited, offered, invited, and required Class Members to provide their Private Information as part of Defendant's regular business practices. Per Defendant's requirements, Plaintiff and Class Members accepted Defendant's offers and provided their Private Information to Defendant.

156. Plaintiff and Class Members entrusted Defendant with their Private Information with the understanding that Defendant would safeguard their information.

157. Defendant accepted possession of Plaintiff's and Class Members' Private Information for the purpose of engaging with Plaintiff and Class Members to enhance and further their business.

158. When Plaintiff and Class Members provided their Private Information to Defendant for the purpose of receiving services from Defendant, they entered into implied contracts with Defendant.

159. Plaintiff and the Class Members thus entered into implied contracts with Defendant by which Defendant agreed to safeguard and protect their Private Information, to keep such information secure and confidential, and to timely and accurately notify Plaintiff and the Class if their data had been breached and compromised or stolen.

160. Upon entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations (including FTC guidelines on data security) and were consistent with industry standards.

161. Implicit in the agreement between Plaintiff and Class Members and the Defendant to provide Private Information, was the Defendant's obligation to: (a) use such Private Information for business purposes only, (b) take reasonable steps to safeguard that Private Information, (c) prevent unauthorized disclosures of the Private Information, (d) provide Plaintiff and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their Private Information, (e) reasonably safeguard and protect the Private Information of Plaintiff and Class Members from unauthorized disclosure or uses, (f) retain the Private Information only under conditions that kept such information secure and confidential.

162. The mutual understanding and intent of Plaintiff and Class Members on the one hand, and Defendant, on the other, is demonstrated by their conduct and course of dealing.

163. On information and belief, at all relevant times Defendant promulgated, adopted, and implemented a written privacy policy whereby it expressly promised Plaintiff and Class Members that it would only disclose Private Information under certain circumstances, none of which relates to the Data Breach.

164. On information and belief, Defendant further impliedly promised to comply with industry standards and to make sure that Plaintiff's and Class Members' Private Information would remain protected.

165. Plaintiff and Class Members paid money to Defendant with the reasonable belief and expectation that Defendant would use part of their earnings to obtain adequate data security. Defendant failed to do so.

166. Plaintiff and Class Members would not have entrusted their Private Information to Defendant or otherwise have engaged with Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

167. Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of its implied promise to monitor its computer systems and networks to ensure that it adopted reasonable data security measures.

168. Every contract in this State has an implied covenant of good faith and fair dealing, which is an independent duty and may be breached even when there is no breach of a contract's actual and/or express terms.

169. Plaintiff and Class Members fully and adequately performed their obligations under the implied contract with Defendant.

170. Defendant breached the implied contracts made with Plaintiff and the Class by failing to safeguard and protect their Private Information, by failing to delete the information of Plaintiff and the Class once the relationship ended, and by failing to provide accurate notice to them that personal information was compromised as a result of the Data Breach.

171. Defendant breached the implied covenant of good faith and fair dealing by failing to maintain adequate computer systems and data security practices to safeguard Private Information, failing to timely and accurately disclose the Data Breach to Plaintiff and Class Members and continued acceptance of Private Information and storage of other personal information after Defendant knew, or should have known, of the security vulnerabilities of the systems that were exploited in the Data Breach.

172. As a direct and proximate result of Defendant's conduct, Plaintiff and the Class have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) experiencing an increase in spam calls, texts, and/or

emails; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect their Private Information.

173. Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

174. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

**COUNT III**
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class)**

175. Plaintiff re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 107, as if fully set forth herein.

176. This count is plead in the alternative to the Breach of Implied Contract count above.

177. Plaintiff and Class Members conferred a monetary benefit on Defendant in the form of payments made for the purchase of healthcare services.

178. Defendant appreciated or had knowledge of the benefits conferred upon it by Plaintiff and Class Members.

179. The payments for healthcare services that Plaintiff and Class Members paid (directly or indirectly) to Defendant should have been used by Defendant, in part, to pay for the administrative costs of reasonable data privacy and security practices and procedures.

180. As a result of Defendant's conduct, Plaintiff and Class Members suffered actual damages in an amount equal to the difference in value between the health care services with the reasonable data privacy and security practices and procedures that Plaintiff and Class Members paid for, and the inadequate health care services without reasonable data privacy and security practices and procedures that they received.

181. Plaintiff and Class Members have no adequate remedy at law.

182. As a direct and proximate result of Defendant's conduct, Plaintiff and the Class have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) experiencing an increase in spam calls, texts, and/or emails; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect their Private Information.

183. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

184. Under principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiff and Class Members because Defendant failed to implement (or adequately implement) the data privacy and security practices and procedures that Plaintiff and Class Members paid for and that were otherwise mandated by HIPAA regulations, federal, state and local laws, and industry standards.

185. Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds received by Defendant.

186. A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendant traceable to Plaintiff and Class Members.

**COUNT IV**
**Declaratory Judgment**
**(On Behalf of Plaintiff and the Class)**

187. Plaintiff re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 107, as if fully set forth herein.

188. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*, this Court may declare the parties' rights and legal relations and grant further necessary relief. The Court also has broad authority to enjoin tortious conduct and conduct that violates the federal and state laws identified in this Complaint.

189. As a result of the Data Breach, an actual controversy exists concerning the Private Information of Plaintiff and the Class and whether NYCHHC currently maintains data-security measures adequate to protect them from further breaches. Plaintiff alleges that NYCHHC's security measures remain inadequate, that she continues to be injured by the compromise of her PII, and that she remains at imminent risk of further compromise.

190. Pursuant to the Declaratory Judgment Act, this Court should declare, among other things, that:

a. NYCHHC owes a legal duty, under the common law, HIPAA, and applicable state statutes, to secure its patients' and employees' Private Information and to timely notify affected individuals of a data breach; and

b. NYCHHC continues to breach that duty by failing to employ reasonable

measures to secure the Private Information in its possession.

191. The Court should also enter prospective injunctive relief requiring NYCHHC to adopt data-security protocols consistent with the law and industry standards to protect the Private Information in its network.

192. Absent an injunction, Plaintiff will suffer irreparable injury and will lack an adequate remedy at law should another breach occur at NYCHHC. The risk of another breach is real, immediate, and substantial, and many of the injuries a future breach would cause are not readily quantifiable, forcing Plaintiff to bring successive lawsuits to redress the same conduct.

193. The balance of hardships favors an injunction. Plaintiff is likely to face substantial identity theft and other harm if no injunction issues, whereas the cost to NYCHHC of adopting reasonable prospective security measures is comparatively modest – and NYCHHC is already legally obligated to adopt such measures.

194. An injunction would serve, not disserve, the public interest, because it would help prevent another breach at NYCHHC and thereby avert the additional injuries that further compromise of confidential information would cause.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and the Class pray for judgment against Defendant as follows:

a. For an Order certifying the Class, and appointing Plaintiff and their Counsel to represent the Class;

b. For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Private Information of Plaintiff and Class Members;

c. For injunctive relief requested by Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

i. prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

ii. requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

iii. requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiff and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

iv. requiring Defendant to provide out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their Private Information for Plaintiff's and Class Members' respective lifetimes;

v. requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the Private Information of Plaintiff and Class Members;

vi. prohibiting Defendant from maintaining the Private Information of Plaintiff's and Class Members on a cloud-based database;

vii. requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

viii. requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

ix. requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

x. requiring Defendant to segment data by, among other things, creating firewalls and controls so that if one area of Defendant's network is compromised, hackers cannot gain access to portions of Defendant's systems;

xi. requiring Defendant to conduct regular database scanning and securing checks;

xii. requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class Members;

xiii. requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiv. requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xv. requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and

assess whether monitoring tools are appropriately configured, tested, and updated;

xvi. requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

xvii. requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and

xviii. for a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

d. For an award of damages, including actual, nominal, consequential, and punitive damages, as allowed by law in an amount to be determined;

e. For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

f. For prejudgment interest on all amounts awarded; and

g. Such other and further relief as this Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury of all issues in this action so triable as of right.

Dated: May 29, 2026

Respectfully submitted,

**HECHT PARTNERS LLP**

*[/s/ Lori G. Feldman]*
Lori G. Feldman

David L. Hecht
Brittany Sackrin
Justin Alverez-Herman
Tiffany Wong
125 Park Avenue, 25th Floor
New York, New York 10017
T: (212) 851-6821
lfeldman@hechtpartners.com
dhecht@hechtpartners.com
bsackrin@hechtpartners.com
jalverez@hechtpartners.com
twong@hechtpartners.com

*Counsel for Plaintiff and the Putative Class*